## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**AVALON CARRIAGE SERVICE INC.,**

      Plaintiff,

**v.**                                                          **CASE NO. 3:04-CV-1126-J-16MCR**

**CITY OF ST. AUGUSTINE, FLORIDA,**
**a municipal corporation organized under the**
**laws of the State of Florida,**
**MARK LITZINGER, in his individual capacity,**
**WILLIAM HARRISS, in his individual capacity,**
**STUART GAMSEY, individually, GAMSEY**
**CARRIAGE COMPANY, INC., a Florida Corporation,**
**GAM SAN ENTERPRISES, INC., a Florida Corporation**
**and SPIRIT OF ST. AUGUSTINE, INC.,**
**a Florida Corporation,**

      Defendants**.**

_____/

### O R D E R

      Before the Court are Defendants Stuart Gamsey, Gamsey Carriage Company, Inc., Gam San

Enterprises, Inc., and Spirit of St. Augustine, Inc. ("Gamsey Defendants") Motion for Summary

Judgment and attached memorandum (Dkts. 101, 118), Defendants Mark Litzinger and William

Harriss, in their individual capacity, Motion for Partial Summary Judgment and attached

memorandum (Dkts. 104, 109) and Defendants City of St. Augustine, William Harriss and Mark

Litzinger ("City Defendants") Motion for Summary Judgment and memorandum in support (Dkts.

114, 117). Multiple exhibits were attached by all parties and the Plaintiff filed Memoranda  in

Opposition (Dkts. 146-147, 149).

## I.      Procedural Posture

On October 20, 2004, Plaintiff Avalon Carriage Service, Inc. filed a Civil Action by Verified Complaint for Deprivation of Civil Rights and Antitrust Violations Seeking Injunctive Relief and Damages and Demand for Jury Trial (Dkt. 1). The Complaint alleges civil rights violations pursuant to 42 U.S.C. § 1983 (Count I), antitrust violations under 15 U.S.C. § 2 (Count II) and Florida antitrust violations of Chapter 542.19, Florida Statutes (Count III). The Plaintiff is also seeking at least $1.9 million in damages for the civil rights violations, $5.6 million for the antitrust violations as well as treble and punitive damages, injunctive relief, attorney's fees and costs.

In late November and early December 2004, Defendants filed Motions to Dismiss (Dkts. 16, 18). On January 13, 2005, the Court entered an Order denying these Motions (Dkt. 24). All Defendants now move for Summary Judgment and the Court will examine each Defendants arguments in turn.

## II.     Background

Plaintiff is a Florida corporation operating two horse drawn carriages ("HDC") within the city limits of St. Augustine, Florida. According to Defendant City of St. Augustine's code of ordinances, a permit is required to operate a HDC. See St. Augustine Code, Art. 5, § 27. The number of available permits, however, was capped at forty-six by the St. Augustine City Commission ("City Commission") in 1988. Id. § 27-159(a). Plaintiff currently holds or controls only two of the forty-six permits. Plaintiff provides that in July 1996, Defendant City of St. Augustine approved the transfer of thirty-seven horse carriage permits to the Gamsey Defendants. This transfer gave the Gamsey

Defendants' control of forty-four out of forty-six permits.[1] Plaintiff therefore alleges the Gamsey Defendants control ninety-six percent of the carriage business in St. Augustine. Despite controlling forty-four permits, however, the Gamsey Defendants allegedly only operate sixteen carriages while annually renewing the other twenty-eight "unused" permits (Dkt. 1, ¶¶16-17). Plaintiff alleges this situation has prevented it from "expanding its business by acquiring additional permits and competing" in the HDC market (Dkt. 1, ¶6).

Plaintiff specifically alleges that over the past fifteen years it has applied to the City Commission for additional regular and special horse carriage permits, but that each application has been denied. Plaintiff contends its inability to obtain more permits is due to the forty-six permit cap set forth in the code of ordinances as well as the rules promulgated by Defendant Harriss, as the City Manager, and Defendant Litzinger, as Director of Financial Services. Indeed, Plaintiff alleges that from "at least 2000 to the present, the City Commission, under the color of law, by custom and practice, tacitly and expressly approved the adoption of arbitrary and capricious rules promulgated by [Defendant Harriss] and [Defendant Litzinger] governing the horse carriage trade that were in violation of its own code of ordinances and federal and state laws prohibiting monopolies." (Dkt. 1, ¶11). Plaintiff provides that while the permits are not considered property under the language in the ordinances, Defendant City of St. Augustine has suggested Gamsey Defendants sell some of the unused permits for as much as $40,000.00 each. Id. ¶ 19.

Accordingly, Plaintiff's Complaint alleges the Defendants violated the rights afforded to Plaintiff pursuant to the Equal Protection Clause of the Fourteenth Amendment (Count I-(a)) and

---

[1] Gamsey Defendants currently hold forty-two permits as two permits were purchased in 2004 by Country Carriages, Inc. (Dkt. 118 at 5).

the Commerce Clause (Count I-(b)) in the U.S. Constitution, monopolized and conspired to monopolize in violation of Section 2 of the Sherman Act (Count II) as well as violating Florida antitrust laws (Count III).

## III.   Standard of Review

The Court should grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987); Edwards v. Acadia Realty Trust, Inc., 141 F. Supp. 2d 1340, 1344-45 (M.D. Fla. 2001).  The Court will construe the record and all inferences that can be drawn from it in the light most favorable to the nonmoving party, and the moving party bears the initial burden of establishing the absence of a genuine material fact.  See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Samples on Behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Once this burden is met, however, the opposing party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'"  Celotex Corp., 477 U.S. at 342.  The Eleventh Circuit explained in Samples that the opposing party need only present evidence from which a jury might return a verdict in its favor in order to survive the moving party's motion for summary judgment.  See Samples, 846 F.2d at 1330; see also Augusta Iron & Steel Works v. Employers Insurance of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

Notably, the Supreme Court pointed out in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), that the moving party's burden only extends to facts that might affect the outcome of

the lawsuit under the governing law, as "[f]actual disputes that are irrelevant or unnecessary will not be counted." Summary judgment will only be granted if all facts and inferences point overwhelmingly in favor of the moving party, such that a responsible jury could not find in favor of the opposing party. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). If there is conflicting evidence that will permit differing reasonable inferences, the case will be submitted to the jury. See Augusta Iron & Steel, 835 F.2d at 856.

## IV.   Discussion

### A.   The City Defendants' Arguments

The City Defendants argue summary judgment is appropriate as to the Equal Protection and Commerce Clause claims (Count I(a)(b)) under 42 U.S.C. § 1983 as the Plaintiff is unable to prove a deprivation of its constitutional rights. The City Defendants subsequently address the antitrust claims (Counts II-III).

### i.   Equal Protection Claims

The City Defendants contend to the extent Plaintiff is alleging an equal protection claim that the City Defendants promulgated and adopted arbitrary and capricious rules regarding the hack stands or the renewal of permits, the record does not support such an allegation. Moreover, that if the equal protection claim is based on the ordinance regulating horse-drawn carriages ("HDC") and the hack stand, and not the allegedly promulgated "imaginary rules" referenced in the Complaint, the ordinance on its face is not discriminatory as it "provides the same opportunity to all HDCs to compete for the limited number of permits on the open market." (Dkt. 117 at 5-6). City Defendants further argue that if Plaintiff is claiming the facially neutral ordinance governing HDCs was unequally applied, Plaintiff must show intentional discrimination. See E&T Realty v. Strickland, 830

F.2d 1107, 1112-1114 (11th Cir. 1987); <u>Baggs v. City of South Pasadena</u>, 947 F. Supp. 1580, 1584 (M.D. Fla. 1996)). As there is no evidence City Defendants acted with discriminatory intent, City Defendants assert summary judgment is proper.

Plaintiff responds that its equal protection claim is not a facial challenge to a St. Augustine City ordinance, but is instead a challenge to the constitutionality "of the unwritten long standing municipal practice and custom by the City Defendants in the application of City ordinances wherein the City has assisted Gamsey in the renewal of unused permits not for the purpose of Gamsey using them by placing more horse drawn carriages into service as contemplated by City ordinance, but for the illegitimate purpose of denying other similarly situated persons such as Avalon from the same privileges under the City ordinance and to allow Gamsey to deal in a black market of the sale of those permits." (Dkt. 149 at 6-7). Plaintiff argues that such a practice and custom is wholly arbitrary and irrational as it has no relationship to safety or health and is thus outside of the City of St. Augustine's police powers. Moreover, that the application of the practice and custom has violated the City of St. Augustine's code of ordinances (Dkt. 149 at 12)(citing <u>St. Augustine Code</u>, Article 5 § 27). Plaintiff additionally asserts that the City Defendants targeted and harassed it on multiple occasions (Dkt. 149 at 14-15). Plaintiff argues that Defendant Harriss has refused to promulgate rules for the fair use of the hack stands as he has only made sixteen spaces available for the forty-six authorized permits. Plaintiff contends this "insubordination" by Defendant Harriss has been shielded by Defendant Litzinger with the tacit approval of the City of St. Augustine. The shielding has occurred because Defendant Litzinger has knowingly falsified public documents by "falsely claiming various health and welfare reasons" as to why additional permits were adverse to public interest unless they were bought from Defendant Gamsey (Dkt. 149 at 8)(citing Dkt. 143, Exhibits

4, 5).

### ii.      The Court's Analysis

As an initial matter, the Court finds the Plaintiff's statement that it "has essentially alleged both kinds of equal protection claims" problematic (Dkt. 149 at 12). The two kinds of claims Plaintiff appears to be articulating is that the ordinances, or the unlawful custom and practice, create a discriminatory classification and second, that a facially neutral ordinance is having a disparate impact. See (Dkt. 149 at 12). Under either challenge, the Court finds City Defendants are entitled to summary judgment.

The Equal Protection Clause of the Fourteenth Amendment requires that no State shall "deny to any person within its jurisdiction the equal protection of the laws." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Accordingly, similarly situated people should be treated alike. See E&T Realty, 830 F.2d at 1109 ("Different treatment of dissimilarly situated persons does not violate the equal protection clause."), cert. denied, 485 U.S. 961 (1988). In cases where a plaintiff claims the defendant unequally applied a facially neutral statute, "'a plaintiff must show intentional discrimination.'" Reserve, Ltd. v. Town of Longboat Key, 17 F.3d 1373, 1381 (11th Cir. 1994)(quoting E&T Realty, 830 F.2d at 1112). The plaintiff must also show that the Defendant had no rational basis for treating the plaintiff differently. E&T Realty, 830 F.2d at 1113-114 ("'The unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.'")(quoting Snowden v. Hughes, 321 U.S. 1, 8 (1944)). See Baggs, 947 F. Supp. at 1584.

As to Plaintiff's claim of a discriminatory classification, the Court finds no evidence in the record to support this claim. None of the ordinances addressing horse-drawn carriages create such classifications. See St. Augustine Code, Article 5, § 27. For the allegedly unwritten rules, the Court similarly fails to see evidence of a discriminatory classification. For Plaintiff's claim of the discriminatory application of a neutral ordinance, the Court notes Plaintiff is similarly situated to the Gamsey Defendants as both operate HDC businesses in the City of St. Augustine. The Court finds, however, that Plaintiff has not met the burden of demonstrating the City Defendants intentionally discriminated against it. E&T Realty, 830 F.2d at 1109.

The Court specifically notes that Section 27-128(b) of St. Augustine's Code provides the City Manager shall "formulate and promulgate reasonable rules and regulations for the use of such hack stands so as to insure equality of opportunity between operators, and to prevent discrimination between hacks or carriages, and to prevent unfair practices between owners, operators, and drivers of such horse-drawn vehicles for hire." Plaintiff contends the City Manager, Defendant Harriss, has failed to promulgate reasonable rules and regulations and instead allowed the Gamsey Defendants to maintain unused permits. The Court notes that Section 27-160 of the St. Augustine's code governs the renewal and revocation of permits and provides that for any person to whom a permit has been issued "shall be entitled to such permit from year to year; provided, however, that such person shall fully comply with the provisions of this article and such other ordinances, rules and regulations as shall be enacted or adopted. . .provided further," that the St. Augustine City Commission "for good cause shown, may at any time revoke such permit." The Court thus does not find evidence that City Defendants intentionally discriminated against Plaintiff. The City of St. Augustine has placed a cap on the number of available permits, Gamsey Defendants have apparently renewed its permits and

have not given cause for their revocation. Nevertheless, assuming there was discrimination, the Court finds the City Defendants have a rational basis, safety and health, for their decision not to issue additional permits. Accordingly, Plaintiffs equal protection claims (Count I(a)) fail and summary judgment as to the City Defendants is proper

### iii.    Commerce Clause

City Defendants argue that Plaintiff's "sole claim under the Commerce Clause is that the City expressly and tacitly approved arbitrary and capricious rules promulgated by [Defendants] Harriss and Litzinger. . . ." (Dkt. 117 at 9). City Defendants contend because Plaintiff has not identified any rules promulgated by Defendants Harriss and Litzinger, Plaintiff's claim fails. City Defendants additionally assert if Plaintiff is relying upon the operation of the ordinance itself, Plaintiff's claim still fails. Specifically, that because the ordinance evenhandedly regulates in-state and out-of-state businesses and serves a legitimate interest, there is no violation of the commerce clause (Dkt. 117 at 10)(citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

Plaintiff responds that the basis of its commerce clause claim is that the unlawful practices and customs are placing an unreasonable burden on interstate commerce. Indeed, that the customs and practices have displaced "the City's officially promulgated ordinances and have barred both instate (Avalon) and out-of-state (Storey and Canaveri) would be competitors from providing competitive services. . . ."(Dkt. 149 at 17). The practice and customs are therefore placing a burden on interstate commerce causing a violation of the Commerce Clause.

Upon review of the record, the Court agrees with City Defendants. The Supreme Court outlined that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the

burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. See General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997)("The negative or dormant implication of the Commerce Clause prohibits state taxation, or regulation, that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace. . . .'")(internal citations omitted); C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 390 (noting "[t]he central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent.")(internal citations omitted).   In this instance, the Court does not see how either the ordinances or the allegedly unlawful customs and practices have placed an unreasonable burden on interstate commerce. Accordingly, summary judgment in favor of the City Defendants is warranted as to Count I(b).

### iv.     Injunctive Relief & Count I

Count I of the Complaint also seeks injunctive relief to enjoin the "City from enforcing these arbitrary and discriminatory rules that affect interstate commerce. . . ." (Dkt. 1, ¶32). The Court notes that Article III of the United States Constitution requires federal courts to decide only "cases" or "controversies." See Culinary Workers Union, Local 226 v. Del Papa, 200 F.3d 614, 617 (9th Cir. 1999)(citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982)("The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts."). When a plaintiff seeks injunctive relief, the Eleventh Circuit provides that because injunctions regulate future conduct, "'a party has standing to seek injunctive relief only if the party alleges. . .a

real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury.'"

Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)(quoting Wooden v. Board of Regents of Univ.

Sys. of Georgia, 247 F.3d 1262, 1284 (11th Cir. 2001)).

Based upon the foregoing, the Court finds that Plaintiff is not entitled to injunctive relief as

to Count I.  See City of Los Angeles v. Lyons, 461 U.S. 95, 101-113 (1983)(providing the plaintiff

must  demonstrate any "real or immediate threat" of a recurrence of the alleged misconduct). As the

Court did not find the City Defendants were enforcing arbitrary and discriminatory rules, injunctive

relief is not warranted.

### v.    Antitrust Claims

Counts II and III of the Complaint allege the Defendants have committed antitrust violations.

Count II alleges the Defendants monopolized, and conspired to monopolize, in violation of Section

2 of the Sherman Act. Count II also seeks to enjoin the Defendants from continuing to engage in

anticompetitive practices, dissolving the monopoly as well as requesting treble damages. Count III

alleges similar claims under State antitrust statutes.

### vi.    State Action & Antitrust Claims

City Defendants argue that the "state action" doctrine bars Plaintiff from obtaining damages

or injunctive relief as to St. Augustine's horse-drawn carriage regulatory system.[2] The Supreme

Court first articulated the state action doctrine in Parker v. Brown, 317 U.S. 341, 350-51 (1943)

when it decided not to construe the Sherman Act as applying to the anticompetitive conduct of a

State acting through its legislature. In City of Lafayette, La. v. Louisiana Power & Light Company,

---

[2] The Court respectively disagrees with the Magistrate Judge's dictum that the City Defendants failed to raise a defense based upon the state action doctrine. See (Dkt. 87 at 12). The City Defendants' Motion for Clarification (Dkt. 90) is thus rendered moot.

435 U.S. 389, 413 (1978), the Supreme Court provided the "Parker doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." The Supreme Court noted, however, the difference involved if the governmental body sued is a city. Id. ("When cities, each of the same status under state law, are equally free to approach a policy decision in their own way, the anticompetitive restraints adopted as policy by any one of them, may express its own preference, rather than that of the State."). See Town of Hallie v. City of Eau Claire, 471 U.S. 34, 38 (1985)(noting that "[m]unicipalities. . .are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign.")(internal citations omitted). Nevertheless, the Supreme Court outlined that a subordinate governmental unit's claim to such immunity exists when "it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" City of Lafayette, 435 U.S. at 415 (internal citations omitted). Accordingly, before a municipality "will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy." Town of Hallie, 471 U.S. at 41.

City Defendants argue the city derives authority from Florida Statute § 316.008, which provides legislatively-granted power to control traffic on its public streets and roadways. City Defendants also contend that municipalities in Florida have been found to have "'plenary power' to control the commercial use of the same." (Dkt. 117 at 12)(citing Jarrell v. Orlando Transit Co., 167 So. 664, 666 (Fla. 1936)). Furthermore, City Defendants bring attention to an act of the territorial legislature in 1822, which incorporated the City of St. Augustine and granted the City "full

12

power and authority. . .to provide for licensing and regulating. . .hackney carriages, waggons [sic], carts and drays. . . ."(Dkt. 117 at 13, Exhibit A). City Defendants note that Section 111 of Chapter 11148, 1925 Laws of Florida expressly delegated to the City the following powers:

> The municipality is hereby authorized and empowered to license, control, tax and regulate all traffic and all sales upon the streets, sidewalks and public places within the city, and. . .to license and cause to be registered, and to control, tax and regulate all carriages, . . .wagons, drays,. . .and all other vehicles, and to license, tax, control, regulate and register the drivers thereof, and to fix the rate to be charged for the carriage of persons and property for hire within the limits of the municipality. . . .

(Dkt. 117 at 13, Exhibit B)(citing Chapter 13349, 1927 Laws of Florida, Section 20(b), and Chapter 14375, 1929 Laws of Florida, Section 28). These Defendants assert subsequent amendments have left intact the City's powers to regulate carriages (Dkt. 117 at 13)(citing Chapter 18873, 1937 Laws of Florida; Chapter 24860, 1947 Laws of Florida). Lastly, City Defendants note that following the ratification of the 1968 Florida Constitution, Florida's legislature reaffirmed all of its explicit grants of power to the City in providing that "All existing special acts pertaining exclusively to the power or jurisdictions of a particular municipality except as otherwise provided in Subsection (4) shall become an ordinance of that municipality on the effective date of this Act, subject to modification or repeal as other ordinances." Florida Statute § 166.021(5).

City Defendants therefore assert the state action exemption is applicable as it was authorized to regulate HDCs. This explicit authorization included the ability to restrict the total number of permits available as well as handling both the annual renewal and revocation of those permits (Dkt. 117 at 14)(citing Campbell v. City of Chicago, 639 F. Supp. 1501, 1503 (N.D. Ill. 1986)).

Plaintiff responds that the ordinances upon which the City Defendants rely prohibits such conduct rather than authorizing it. Plaintiff argues the City Defendants "ignore the relevant fact that they were not authorized under state law to engage in state anticompetitive action involving horse

driven carriages" and that the question of whether the City Defendants were authorized to displace competition is one of state law (Dkt. 149 at 18). Specifically, that binding Florida precedent requires it must be clear that the state law has delegated to the municipality "'the express authority to take action that forseeably will result in anticompetitive effects'. . . [t]he fact that the state has made a general delegation of home rule power to the local government is not enough to authorize anticompetitive action." Duck Tours Seafari, Inc. v. City of Key West, 875 So.2d 650, 653-55 (Fla. DCA 2004), *pet. for review denied,* 2004 Fla. Lexis 2183 (Fla. Nov. 22nd 2004)(internal citations omitted). Plaintiff contends the suppression of competition is not a foreseeable result flowing from the general grants of authority in Florida Statute §§ 316, 166 or from the laws of 1822 and 1929. Lastly, Plaintiff argues the separation of powers doctrine prevents the Defendants from using an arbitrary custom to carry out facially neutral City ordinances regulating hack stands as the City's legislative body "would have no authority to delegate such unbridled authority in the first place." (Dkt. 149 at 20).

The Court initially notes the court in Duck Tours rejected the City of Key West's argument that Florida Statute § 316.008 provided them with authorization to articulate ordinances that displaced competition. 875 So.2d at 654. The Duck Tours court also provided that the City of Key West had not cited any legislative enactment which would authorize the granting of an exclusive franchise. Id. at 655. Conversely, in this case, the Court finds there to be a legislative enactment given to the City of St. Augustine which authorizes the City to control, tax, regulate carriages, wagons and drays. See § 111 of Chapter 11148, 1925 Laws of Florida. This detailed legislative enactment specifically authorizes the City of St. Augustine to regulate carriages and wagons. The Court finds that this gave the City "express authority to take action that foreseeably will result in

anticompetitive effects." <u>Town of Hallie</u>, 471 U.S. at 43. Accordingly, the Court finds the City Defendants' actions to be exempt from the Sherman Act and summary judgment as to Count II in all respects is therefore warranted in the City Defendants favor. This conclusion necessitates that summary judgment is also proper for the City Defendants as to Count III. <u>See</u> <u>Duck Tours</u>, 875 So.2d at 653 ("Under Florida law, "[a]ny activity or conduct. . .exempt from the provisions of the antitrust laws of the United States is exempt from the provisions of this chapter [542].")(quoting Florida Statute § 542.20).

**B.     Defendants Harriss and Litzinger, Individually**

Defendants Harriss and Litzinger filed a separate memorandum arguing they are entitled to partial summary judgment in their individual capacities.

**i.     Qualified Immunity**

Defendants Harriss and Litzinger assert they are entitled to qualified immunity against individual damages liability for the alleged violations of 42 U.S.C. § 1983 (Count I). Specifically, these Defendants contend that Plaintiff is attempting to partially blame them because they "(1) failed to issue [Plaintiff] new permits" beyond the forty-six authorized under the code (Dkt. 109 at 4). Second, that these Defendants "failed to revoke that portion of the forty-two (42) permits previously issued to the Gamsey Defendants which [Plaintiff] unilaterally. . .classifies as 'unused' and issue them to [Plaintiff] instead; or (3) renewed Gamsey's. . .[p]ermits, rather than refusing to do so and reissuing them to Plaintiff." <u>Id.</u> at 4-5. Defendants Harriss and Litzinger contend the actions, or inactions, were either within the power of the City Commission or were dictated via the language in the City of St. Augustine's ordinances. Consequently, Defendants Harriss and Litzinger argue qualified immunity is appropriate.

Plaintiff responds that genuine issues of material fact continue to exist as to whether Defendants Harriss and Litzinger acted within the scope of their authority thus entitling them to qualified immunity. Plaintiff contends Defendant Harriss is charged by St. Augustine's ordinances "to promulgate rules and regulations to prevent unfair business practices and with [Defendant] Lizinger's assistance, acted as sales agents for Gamsey's black market dealing of public permits." (Dkt. 147 at 3). Indeed, that Defendant Harriss has refused to promulgate rules for equal opportunity and fair use of the City's hack stands as only sixteen hack spaces are available for the City's forty-six authorized permits (Dkt. 147 at 4). Plaintiff also alleges Defendant Litzinger knowingly falsified public documents Id. As a result, Plaintiff argues Defendants Harriss and Litzinger acted beyond the scope of their authority and have violated clearly established law and qualified immunity is not proper.

### ii.    The Court's Analysis

The defense of qualified immunity protects "government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Eleventh Circuit provides that the defense of qualified immunity protecting government officials is the "usual rule. . . [and] only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." Lassiter v. Alabama A&M University, 28 F.3d 1146 (11th Cir. 1994); See Hope v. Pelzer, 536 U.S. 730 (2002); Gonzalez, 325 F.3d at 1233 (noting the purpose of the immunity is to protect "'from suit all but the plainly incompetent or one who is knowingly violating the federal law.'")(internal citation omitted).

16

In order to receive qualified immunity, the government official "must first prove he was acting within his discretionary authority." <u>Gonzalez</u>, 325 F.3d at 1234 (internal citations omitted). <u>See</u> <u>Harbert Int'l Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998)("'A court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'"). If the public official establishes this requirement, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002)(internal citation and quotation marks omitted). To determine if the plaintiff met this burden, the Supreme Court has provided a two-part test for qualified immunity analysis: (1) "'[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right'" and (2) "if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then consider 'whether the right was clearly established.'" <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1314 (11th Cir. 2003)(internal citation omitted). If no constitutional violation is established, then the officer prevails and no further inquiry is required. <u>Id.</u> "On the other hand, if the facts establish a constitutional violation, we must determine whether, at the time of the violation, the right was clearly established, an inquiry that 'must be undertaken in light of the specific context of the case [and] not as a broad general proposition. . . .'" <u>Id.</u> (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).

As to whether Defendant Harriss was acting within his discretionary authority, the Court has previously noted  that Article V, Section 27-128(b) of St. Augustine's ordinance states the City Manager shall "formulate and promulgate reasonable rules and regulations for the use of such hack stands so as to insure equality of opportunity between operators, and to prevent discrimination

between hacks or carriages, and to prevent unfair practices between owners, operators, and drivers of such horse-drawn vehicles for hire." Pursuant to this ordinance, according to Plaintiff, Defendant Harriss had the authority to make rules to prevent the hoarding of unused permits and that his failure to promulgate rules affording equal opportunities cannot be said to be within his discretionary authority (Dkt. 147 at 7). The Court disagrees and finds Defendant Harriss has not acted beyond his discretionary authority. The Court also notes, and has previously discussed, the various other ordinances concerning the issuance and revocation of permits. See St. Augustine Code, Article V §§ 27-156-157, 159-160.

Moreover, as to Plaintiff's allegations that Defendant Litzinger acted beyond the scope of his authority by knowingly falsifying public documents, the Court does not agree. Plaintiff takes issue with a 1999 memorandum in which Defendant Litzinger states "[s]ince becoming Financial Services Director, there has been no request from the general public, businesses or organizations to the Financial Services Department, or other departments within the City, for additional carriages to be placed into service to meet the current demand." (Dkt. 143, Exhibit 4 at 2-4). Plaintiff responds to this sentence by providing letters written to the City Manager and City Commissioners throughout February and March 1996 supporting Plaintiff's request for additional permits. At a minimum, Defendant Litzinger's statement appears to be inaccurate. Nevertheless, the remaining aspects of the memorandum addresses concerns with safety and these concerns are supported by the attached memoranda from the Police and Fire Chiefs. See (Dkt. 143, Exhibit 2). The Court therefore does not find this supportive of the allegation Defendant Litzinger was acting beyond the scope of his discretionary authority.

Lastly, to the extent Plaintiff argues Defendants Harriss and Litzinger's conduct pursuant

to the allegedly unlawful custom and practice of the Defendants was outside the scope of their discretion, the Court disagrees. While Plaintiff alleges that these Defendants have promulgated unwritten rules "promoting and protecting the abuse of the permitting process pertaining to the maintenance and renewal of unused horse carriage licenses," the Court does not find the existence of any actions demonstrating these Defendants were acting beyond the scope of their authority.

The next step for the Court to consider is whether Defendant Harriss and Litzinger's conduct violated the Equal Protection Clause or the Commerce Clause as alleged in Count I. See Storck, 354 F.3d at 1314. As the Court set forth the alleged bases for these claims in Section IV-A(i)-(iii), a complete recapitulation is unnecessary. Nevertheless, for the equal protection claims, Plaintiff challenges the alleged "discriminatory classification created by the unwritten custom and practice promulgated by [Defendants] Litzinger and Harriss," as well as asserting this unconstitutional custom and practice was intentionally applied to Plaintiff for the purpose of discriminating against it (Dkt. 147 at 12-13). Moreover, Plaintiff argues Commerce Clause violations may be maintained where local government places an unreasonable burden on interstate commerce pursuant to facially neutral regulation.

Taking these alleged facts in the light most favorable to the Plaintiff, however, the Court does not find that Defendants Harriss and Litzinger's conduct violated a constitutional right. Indeed, the record neither reflects a classification nor does it support intentional discrimination. The Court also fails to find any evidence supporting their violation of the Commerce Clause. Even assuming the existence of a constitutional violation, the Court does not find the right to be clearly established when it is viewed in light of the specific context of this case. See Storck, 354 F.3d at 1317. As a result, the Court therefore finds that qualified immunity applies. The Court also finds injunctive

19

relief is not proper for the reasons discussed in Section IV-A(iv). Summary judgment in all respects as to Count I for Defendants Harriss and Litzinger is therefore warranted.

### iii.    Immunity from Antitrust Violations

Defendants Harriss and Litzinger contend because they were acting only in their official capacities, they are entitled to immunity from Count II pursuant to the Local Government Antitrust Act ("LGAA"). <u>See</u> 15 U.S.C. §§ 34-36. The act provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act. . .from any local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35(a). <u>See</u> 15 U.S.C. § 36(a). Plaintiff conversely contends that because these Defendants' conduct was not undertaken in their official capacities, they are not entitled to immunity for allegedly engaging in a conspiracy to monopolize (Dkt. 147 at 17-18). Plaintiff specifically argues because criminal acts were involved in this case, the falsification of documents by public officials, immunity is inapplicable. Plaintiff also argues that the separation of powers doctrine under the Florida Constitution places constraints on local governments and prohibits them from delegating "unbridled power to their subordinate officials to enforce facially neutral regulations by whim, by showing favoritism, or by exercising unbridled discretion." (Dkt. 147 at 17)(citing <u>Lewis v. Bank of Pasco County</u>, 346 So.2d 53, 55-56 (Fla. 1977)).

Upon review of the record, the Court agrees with the Defendants. The LGAA was passed by Congress in response to "'an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in public interest.'" <u>GF Gaming Corp. v. City of Black Hawk, Colo.</u>, 405 F.3d 876, 885 (10th Cir. 2005)(internal citations omitted). The legislative history of the LGAA demonstrates that Congress intended the phrase "acting in an official capacity"

to be given broad meaning encompassing all "lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position." Sandcrest Outpatient Services, P.A. v. Cumberland County Hosp. Sys. Inc., 853 F.2d 1139, 1145 (4th Cir. 1988). The Court also recognizes the "argument that allegations of a conspiracy convert otherwise authorized conduct into unauthorized conduct" has previously been rejected under the LGAA. Id. at 1145. See GF Gaming Corp., 405 F.3d at 885. Based upon the foregoing, the Court finds immunity to be applicable for Defendants Harriss and Litzinger and summary judgment as to Counts II and III is warranted. See Duck Tours, 875 So.2d at 653; Florida Statute § 542.30.

### iv.     Noerr-Pennington Doctrine

Defendants Harriss and Litzinger briefly provide that if Plaintiff is trying to assign individual liability to them under Section 2 of the Sherman Act for "counseling the [City] Commission not to issue" Plaintiff more permits, such liability is barred under the Noerr-Pennington doctrine (Dkt. 109 at 19, n.11). Plaintiff responds that a "sham" exception exists where an individual uses the governmental process itself as an anticompetitive weapon and causes the process to be abused. Plaintiff argues the process of allowing the renewal of twenty-nine permits, not for the purpose of using them, but "as an instrument of oppression to prevent competition" is an abuse and precludes the application of immunity (Dkt. 147 at 18).

"The federal anittrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." City of Columbia, 499 U.S. at 379-80. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 140 (1961). The Supreme Court outlined that "'Noerr shields from the Sherman Act a concerted effort to influence public

21

officials regardless of intent or purpose.'" <u>City of Columbia</u>, 499 U.S. at 380 (quoting <u>Mine Workers v. Pennington</u>, 381 U.S. 657, 670 (1965)). An exception to this rule, however, exists. Known as the "sham" exception, it encompasses "situations in which persons use the governmental process- as opposed to the outcome of that process- as an anticompetitive weapon." <u>City of Columbia</u>, 499 U.S. at 380.

The Court notes that both of these Defendants are members of the local government and are not private individuals. <u>See</u> <u>City of Columbia</u>, 499 U.S. at 380 (noting "[t]hat a private party's political motives are selfish is irrelevant [under Noerr]. . . ."). Nevertheless, the Court finds that to the extent the Plaintiff is attempting to impose individual liability on Defendants Harriss and Litzinger for counseling the City Commission not to issue Plaintiff additional permits, immunity under the <u>Noerr-Pennington</u> doctrine is applicable.

**C.     Gamsey Defendants**

For purposes of clarification, the Court notes that the Gamsey Defendants include Mr. Stuart Gamsey who is the owner and operator of the following corporations: Gamsey Carriage Co., Inc., Gam San Enterprises, Inc., and Spirit of St. Augustine, Inc.

**i.     Standing & § 1983**

Gamsey Defendants contend Plaintiff has failed to demonstrate it has standing to bring a civil rights claim. <u>See</u> <u>Dillard v. Baldwin County Commissioners</u>, 225 F.3d 1271, 1275 (11th Cir. 2000)("[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims."). Plaintiff responds that standing does exist as Plaintiff has shown the necessary prerequisites.

The Eleventh Circuit recently outlined that a plaintiff must make three showings to satisfy

the constitutional requirements of standing. "First, the plaintiff must have suffered an 'injury in fact'– an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" Bochese v. Town of Ponce Inlet, 405 F.3d 964, 980 (11th Cir. 2005)(internal citations omitted). Next, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly. . .trace[able] to the challenged action of the defendant, and not . . .th[e] result [of] the independent action of some third party not before the court.'" Id. Lastly, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id.

Upon review of the record, the Court finds that Plaintiff does have standing to bring a 42 U.S.C. § 1983 claim. Plaintiff alleges violations of the Equal Protection Clause and the Commerce Clause (Count I). Specifically, that because Gamsey Defendants are able to control the supply and price of horse drawn carriages, Plaintiff has been unable to expand his business. Plaintiff argues that Gamsey Defendants, acting in conjunction with the City Defendants, have caused Plaintiff to suffer money damages. These alleged violations would be "redressed by a favorable decision." Accordingly, the Court finds Plaintiff has met the constitutional requirements of standing.

The Court notes, however, that to recover under § 1983, Plaintiff must prove two elements. "First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). The Court will review these in turn.

ii.      **Equal Protection Claims**

Because Section IV-A(i)(ii) discussed Plaintiff's equal protection claims and set forth the

applicable analysis, the Court does not find it necessary to provide another summary. The Court does

find, however, it useful to provide the Gamsey Defendants argument that "Plaintiff is apparently

alleging two types of equal protection challenges: one focusing on the discriminatory application

of a neutral law; and the other alleging that the ordinances on their face create a discriminatory

classification." (Dkt. 118 at 11).

As an initial matter, the Court notes that "[a]n equal protection claim revolves around

whether similarly situated persons are treated differently." Reserve, Ltd. v. Town of Longboat Key,

17 F.3d 1374, 1381 (11th Cir. 1994). Despite Gamsey Defendants' arguments Plaintiff is not

similarly situated due its financial status, the Court disagrees. See (Dkt. 44, Deposition of Defendant

Gamsey at 175)(noting "[a] horse and a carriage is a horse and a carriage."). The Court does find,

however, that Plaintiff's claims of equal protection violations are without merit and that summary

judgment in favor of Gamsey Defendants as to Count I(a) is proper.

To the extent Plaintiff does raise a challenge that the ordinances, or unwritten ordinances,

create a discriminatory classification, the Court finds such a claim to be without merit. As was noted

above, none of the ordinances addressing horse-drawn carriages create such classifications. See St.

Augustine Code, Article 5, § 27. As to the claim of the discriminatory application of a neutral law,

 Plaintiff must show intentional discrimination. E&T Realty, 830 F.2d at 1112 (11th Cir. 1987).

The Court finds that Plaintiff has failed to meet this burden. Instead, it appears to the Court that for

over the last thirty years, despite receiving many applications, the City of St. Augustine issued

permits only once in 1986.  See (Dkt. 118, Exhibit 9A at 100-01; Dkt. 144, Exhibit 7). At that time,

24

the City issued special permits, which ultimately became regular permits, to anyone who made the request (Dkt. 118, Exhibit 8 at 25-27; Dkt. 143 at 1). Since 1970, as noted by the Gamsey Defendants, the City has denied requests for new permits, including applications by Plaintiff and Defendant Gamsey (Dkt. 118 at 13). During this same period, the City has also approved applications regarding the transfer of permits. Moreover, on December 29, 2004 the City Commission held a special meeting and discussed the effects of more horse-drawn carriages. Due to concerns expressed by the Fire Chief, Police Chief and Director of Public works regarding public safety, traffic and sanitation, the City Commission denied all applications for additional permits as not being in the best interests of the City (Dkt. 118, Exhibit 14).  Moreover, Plaintiff attempts to bolster this claim by raising arguments concerning property interest in the permits, or lack thereof, as well as the alleged harassment employed by City Defendants against any competitors of the Gamsey Defendants. For purposes of an equal protection claim, however, the Court finds Plaintiff has not demonstrated the requirements for a violation of its equal protection rights. As a result, the Court need not examine whether Gamsey Defendants acted under "color of law." Adickes, 398 U.S. at 150 (noting the second element under § 1983 requires a plaintiff show the defendant acted "'under color of law.'"). See Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1277 (11th Cir. 2003)(listing the three tests the Supreme Court has used to determine whether state action exists). Summary judgment in favor of Gamsey Defendants is therefore warranted on the equal protection claims in Count I(a).

### iii.    Commerce Clause

Section Section IV-A(iii) discussed the analysis required when a facially neutral ordinance is alleged to have violated the Commerce Clause. See Pike, 397 U.S. at 142; Nat'l Bus. Aviation

Ass'n, Inc. v. City of Naples Airport Auth., 162 F. Supp. 2d 1343, 1348-49 (M.D. Fla. 2001). Gamsey Defendants contend they are "unclear" how they are liable for a Commerce Clause violation and assert Plaintiff's allegations "are especially confusing as no demonstrable facts tend to show any adverse effect on out-of-state interests versus in-state interests." (Dkt. 118 at 14). Plaintiff responds that both Gamsey and City Defendants' conduct "pursuant to a longstanding custom and practice in the application of a facially neutral ordinance" have prevented in state and out of state competitors the ability to provide competitive services and price to intra and interstate tourists (Dkt. 146 at 19).

Upon review of the record, it is clear to the Court that Plaintiff has failed to demonstrate how the Gamsey Defendants have violated the Commerce Clause. Plaintiff argues that because the City Defendants unlawful custom and practice would not exist "without Gamsey's joint participation in hoarding the 28 unused permits," Gamsey Defendants are liable. The Court finds this argument to be without merit. The Court also finds injunctive relief is not warranted for the reasons explained in Section IV-A(iv). Gamsey Defendants are therefore entitled to summary judgment as to Count I.

### iv.    Antitrust Violations

Gamsey Defendants contend summary judgment is appropriate for both the federal antitrust violations (Count II) and the Florida antitrust claim (Count III). Gamsey Defendants contend Florida law has adopted as precedent federal law developed under the Sherman Act and therefore treats both antitrust causes of action as one (Dkt. 188 at 16)(citing Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1556 n.20 (11th Cir. 1996)). Because Gamsey Defendants contend Plaintiff lacks standing to bring an antitrust claim as it has not demonstrated an antitrust injury, the Court will begin with a discussion of standing.

a.      **Standing for Federal Antitrust Claims**

In an antitrust case, standing involves more than the "case or controversy" requirement that drives constitutional standing. Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1448 (11th Cir. 1991)(internal citations omitted). Antitrust standing is therefore not "simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." Id. (citing Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31 (1983)). See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5 (1986). In cases where a plaintiff is seeking treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), the Eleventh Circuit has provided a two-pronged approach  to examine whether a plaintiff is a proper party and thus should be afforded antitrust standing. Todorov, 921 F.2d at 1449. "First, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws. . . ." Id.

The Supreme Court has defined an antitrust injury as "the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). The Eleventh Circuit notes this limitation is essential because "'it requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation. . .increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'" Todorov, 921 F.2d at 1449-50 (internal citations omitted).

As for determining whether the plaintiff is an efficient enforcer of the antitrust laws, several factors need to be analyzed. Specifically, a court will examine the "'nature of the plaintiff[s'] alleged

injury,'" "'the directness or indirectness of the asserted injury,'" "avoiding duplicative recoveries and the danger of complex apportionment of damages" and the danger "the plaintiff's damages will include some damages more properly attributed to a less remotely injured party. . . ." Todorov, 921 F.2d at 1451 (quoting Associated Gen. Contractors, 459 U.S. at 540).

Gamsey Defendants assert that antitrust laws are concerned with injuries to competition, not to individual competitors (Dkt. 118 at 17)(citing Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)). As a result, antitrust law does not protect a competitor, "but rather focuses upon the consumer's rights to purchase products and services in a competitive market. Id. at 17-18. Gamsey Defendants provide that if Plaintiff's allegations are taken as true, "then Plaintiff's damages equal the profits of a supra-competitive, or monopolized, market: the result of [Plaintiff] having 12 or 24 permits and Gamsey effectively having the rest." Id. at 18. Plaintiff responds that its own injury coincides with the public detriment as enforcement of the antitrust laws will foster competition. With increased competition, the "artificially high prices" currently maintained by the Gamsey Defendants will be eliminated (Dkt. 146 at 2).

Despite the Court's concern as to whether Plaintiff's injury "coincides with the public detriment tending to result from the alleged violation," the Court finds, albeit hesitantly, that Plaintiff has suffered an antitrust injury. See Austin v. Blue Cross and Blue Shield of Alabama, 903 F.2d 1385, 1389-90 (11th Cir. 1990)(internal citations omitted). Moreover, the Court also hesitantly finds Plaintiff to be an efficient enforcer of the antitrust laws. Plaintiff argues it charges "significantly less" than the Gamsey Defendants and that an excess demand was demonstrated in 1994 and 1996 and that "the increased tourism would sustain its expansion well after the monopolistic price was defeated." (Dkt. 146 at 4). Accordingly, the Court finds Plaintiff does have

28

standing to prosecute the alleged violations of Section 2 of the Sherman Act.

  **b.**     **Monopolization Claim & §2 of the Sherman Act**

In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as consequence of superior product, business, acumen, or historic accident." U.S v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). See Morris Communications Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295 (11th Cir. 2004). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." Morris Communications Corp., 364 F.3d at 1294 (internal citations omitted). The second element requires "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." Id. See Consultants & Designers, Inc. v. Butler Serv. Group, Inc., 720 F.2d 1553, 1562 (11th Cir. 1983)("The relevant inquiry is not whether [a company's] present attempt to exclude adversely impacts competition but rather whether its acquisition of the power to exclude competitors had a sufficiently adverse impact on competition to constitute a [Sherman Act] violation.")

Gamsey Defendants contend Plaintiff's expert has failed to appropriately define the relevant market share. Gamsey Defendants also argue Plaintiff cannot prove that Gamsey Defendants have the power to raise prices to supra-competitive levels. Indeed, that while Plaintiff "charges $16.50 per adult and $6 per child, and Gamsey Defendants charge $20 per adult and $10 child," prices are primarily set by "haggling" with tourists (Dkt. 118 at 19). Lastly, Gamsey Defendants note that no participant in the carriage market is required to charge the maximum price that is set by the City of St. Augustine. Conversely, Plaintiff asserts  the units it would add to the market at a reduced rate

29

would defeat the monopoly price and that these additional units would generate profits which are being denied by this unlawful scheme. Plaintiff argues it has stated a claim for monopolization under Section 2 of the Sherman Act as direct evidence, as well as circumstantial evidence, exist of Defendant Gamsey's market power. See Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000) ("The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects. . .[t]he other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share" is greater than whatever threshold is important for the practice in the case.).

Plaintiff contends here that direct evidence is available as Defendant Gamsey "expressly admits" to manipulating price and output and this shows Defendant Gamsey maintained market power (Dkt. 146 at 5) (citing Dkt. 121, Ex. 1 at 27, 48-53). Plaintiff references the fact that Defendant Gamsey requested the City of St. Augustine to raise the maximum price from $55.00 to $85.00 and that the City complied (Dkt. 146 at 6)(citing Dkt. 121, Exhibit 1 at 47-49). Alternatively, Plaintiff argues practical indicia, such as the uniqueness of the industry, the existence of distinct prices as well as the industry and public perception demonstrate through circumstantial evidence Gamsey Defendants' market power.

Based upon the foregoing, the Court agrees with Plaintiff. Although it is notable that the price differences from what Plaintiff charges and that of the Gamsey Defendants is at most $4.00, it is nevertheless clear to the Court that based upon the number of available permits held by the Gamsey Defendants, there is evidence of monopoly power. See PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 107 (2d Cir. 2002)("The core element of a monopolization claim is market power, which is defined as "the ability to raise price by restricting output.")(internal citations omitted). Moreover,

to the extent Gamsey Defendants contend Plaintiff's expert has not appropriately defined the relevant market, the Court disagrees. While upon first blush Plaintiff's expert does not appear to have defined the relevant market, the Court finds Plaintiff's expert has raised enough of a genuine issue of material fact.

For the second element of Plaintiff's monopolization claim, whether there have been exclusionary acts or practices that have excluded competition, the Court notes that for a practice to be exclusionary, "it must harm the competitive process and thereby harm consumers. . .[h]arm to one or more competitors will not suffice for a § 2 violation."See Morris Communications Corp. V. PGA Tour, Inc., 364 F.3d 1288, 1294 (11th Cir. 2004)(quoting U.S. v. Microsoft, 253 F.3d 34, 58 (D.C. Cir. 2001)). The Court finds enough evidence in the record to support the possibility that Plaintiff will be able to meet this element and summary judgment in favor of the Gamsey Defendants is therefore not appropriate as to Plaintiff's claims of monopolization.

### c.    Injunctive Relief

Count II also seeks to enjoin the Defendants from engaging in anticompetitive practices. It is unclear to the Court as to whether such relief is being sought pursuant to Section 16 of the Clayton Act, 15 U.S.C § 26, or as a general matter of equity. As the Court is unable to locate an argument as to this issue, the Court will reserve providing an analysis.

### d.    Noerr-Pennington Doctrine

Gamsey Defendants contend if the City Defendants are immune from antitrust liability under the Parker doctrine, Gamsey Defendants are also entitled to immunity. Furthermore, to the extent Plaintiff is challenging the Gamsey Defendants' lobbying efforts, the Gamsey Defendants "are protected and immune" under the Noerr-Pennington doctrine.

31

Plaintiff contends that <u>Noerr-Pennington</u> does not apply in instances when the government process is being abused. Indeed, that Defendant Gamsey's use of the permit process in being able to renew twenty-eight permits with the intent of not using them demonstrates that both Defendant Gamsey's use of the process is a sham and the entire process itself has become a sham.

Initially, the Court does not agree that because <u>Parker</u> immunity applies to the City Defendants, *ipso facto* it applies to the Gamsey Defendants. <u>See</u> <u>Town of Hallie</u>, 471 U.S. at 45-46, n.10; <u>FTC v. Ticor Title Ins. Co.</u>, 504 U.S. 621, 633 (1992). As to the <u>Noerr-Pennington</u> doctrine, the Court recognizes there is no distinction between petitioning government officials and conspiring with them. <u>GF Gaming</u>, 405 F.3d at 883 (internal citations omitted). Nevertheless, in this instance, the Court finds it possible that the sham exception is applicable. The process of renewing permits without any intent on utilizing them raises enough of a genuine issue of material fact as to preclude summary judgment. <u>Id.</u> at 884 ("The exception thus 'involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all'. . . .")(internal citation omitted). Consequently, summary judgment as to the antitrust claims for the Gamsey Defendants is not proper. Accordingly, upon due consideration, it is hereby **ORDERED and ADJUDGED**:

1.  City Defendants' Motion for Summary Judgment (Dkt. 114) is **GRANTED.**

2.  Defendants Harriss and Liztinger's Partial Motion for Summary Judgment (Dkt. 104) is **GRANTED.**

3.  Gamsey Defendants' Motion for Summary Judgment (Dkt. 101) is **GRANTED in part.**  Summary Judgment as to Count I is **GRANTED** in favor of the Gamsey Defendants. The antitrust claims against the Gamsey Defendants in Counts II and III remain viable.

**DONE AND ORDERED**, at Jacksonville, Florida, this  23      day of February, 2006.

Copies to:         Counsel of record

JOHN H. MOORE II
United States District Judge